**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0516n.06

No. 12-6229

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*May 23, 2013*
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| SHELIA RENEE RUNKLE, Administratrix of the Estate of Robert Earl Runkle, Deceased, ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY |
| Plaintiff - Appellant, ) ) | |
| v. ) ) | |
| FREDERICK W. KEMEN, M.D., Kentucky State Reformatory, ) ) ) | |
| Defendant - Appellee, ) ) | |
| and ) ) | |
| BECKY PANCAKE, et al., ) ) | |
| Defendants. ) | |

**BEFORE: GIBBONS and WHITE, Circuit Judges; COHN, District Judge.[*] [**]**

**HELENE N. WHITE, Circuit Judge.** Plaintiff Shelia Renee Runkle (Plaintiff), the administratrix of the estate of Robert Earl Runkle (Runkle), a former Kentucky prisoner, appeals the district court's grant of summary judgment in favor of Dr. Frederick W. Kemen, dismissing Plaintiff's 42 U.S.C. § 1983 claim alleging that, as one of Runkle's prison physicians, Dr. Kemen

---

[*]We amend the caption as reflected in this opinion.

[**]The Honorable Avern Cohn, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

was deliberately indifferent to Runkle's serious medical needs in violation of the Eighth Amendment. We AFFIRM.

## I.

## A.

This action concerns a four-month delay in Runkle being diagnosed with and receiving surgery for recurrent colon cancer, following his transfer to the Kentucky State Reformatory (KSR) in October 2006. Runkle's medical history prior to that transfer is undisputed:

> Runkle was diagnosed with and treated for colon cancer while confined as a state prisoner at the Western Kentucky Correctional Complex. After undergoing surgery and chemotherapy, he was diagnosed as free of any metastatic disease. He was subsequently transferred to the Little Sandy Correctional Complex ("LSCC"), where he advised the institution that he was due in June 2006 for his yearly colonoscopy.

*Runkle v. Fleming*, 435 F. App'x 483, 483–84 (6th Cir. 2011). On October 10, 2006, Dr. Ewell Scott of St. Claire Regional Medical Center (St. Claire RMC) performed the colonoscopy. He found a mass in Runkle's distal sigmoid colon and recommended having the procedure repeated if the biopsies did not show malignancy, as he was suspicious of a tumor recurrence. Three days later, Dr. Scott's pathological diagnosis indicated that Runkle had a tubular adenoma in his sigmoid colon, which is a benign tumor that could lead to malignant cancer.

On October 16, Dr. Ronald Fleming, an LSCC physician, ordered Runkle's urgent transfer to KSR for a higher level of care. Dr. Fleming recommended surgical removal of the mass found in Runkle's colon. He stated that, although Dr. Scott found a tubular adenoma, the colonoscopy report also indicated that the area was "angry, red and friable."

Runkle arrived at KSR on October 18 and was assigned to a medical dorm. Dr. Kemen, a KSR physician, was assigned as Runkle's primary care provider. The same day as Runkle's arrival, Nurse Practitioner Roy Washington requested a surgical consult for removal of the mass. On October 19, Nurse Practitioner Michael Haun, Dr. Kemen's assistant, physically examined Runkle, questioned him about his condition, and noted his cancer history and complaints of abdominal pain and blood in his stool. Haun noted his plan to obtain Runkle's medical records, including the colonoscopy report.

Dr. Kemen did not separately evaluate Runkle at that time; he planned to obtain Runkle's medical records to assess the appropriate course of treatment. On October 24, a nurse practitioner requested Runkle's "complete medical records" from St. Claire RMC. Meanwhile, on October 26, Washington submitted a surgical consult request for Dr. Thomas Hart, an outside provider, to evaluate Runkle.

On November 3, Dr. Kemen received Runkle's records. At his deposition, he testified that he reviewed the colonoscopy report, the biopsy report, and the accompanying esophagogastroduodenoscopy (EGD) report.[1] He then ordered a sigmoidoscopy (a minimally invasive exam of the large intestine through the rectum) with biopsy to be performed "ASAP." Dr. Kemen noted that Dr. Scott was suspicious of malignancy. He recommended that the sigmoidoscopy should be performed "inasmuch as cancer is extremely likely." CorrectCare-Integrated Health, Inc. (CorrectCare), Dr. Kemen's employer and a contract vendor, manages the

---

[1]Dr. Scott had performed an EGD as well as the colonoscopy.

healthcare for KSR inmates. When a prison physician refers an inmate to an outside provider for evaluation or treatment, CorrectCare personnel must approve the referral. Once approved, administrative clerks are responsible for scheduling the appointment with the outside provider and coordinating the inmate's transport by prison security.

On November 7, Dr. Kemen discharged Runkle to the general prison population pending the sigmoidoscopy, based on his judgment that Runkle was stable and did not require intensive care pending the procedure. The sigmoidoscopy, however, was not performed. On November 9, the Therapeutic Level of Care Committee (the review committee), the board of physicians (including Dr. Kemen) and nurse practitioners responsible for reviewing consultation requests, approved Washington's surgical consult request. The review committee concluded that Runkle's rectal mass, whether malignant or benign, had to be removed—thus rendering the sigmoidoscopy moot. Dr. Kemen did not object to the review committee's decision to forgo his consult request.

On November 20, Dr. Hart evaluated Runkle. He expressed a need to review the original colonoscopy report, ordered a CT-scan of Runkle's abdomen/pelvis, and noted that he would see Runkle again after the CT-scan was performed. Pursuant to Dr. Hart's direction, Washington requested the CT-scan the next day. On December 5, CorrectCare approved the CT-scan request. Dr. Kemen testified that he received an inquiry from a CorrectCare review nurse regarding the necessity of the CT-scan. He told the nurse that he agreed with Dr. Hart's assessment. On December 6, Washington examined Runkle due to complaints of stomach pain, loss of appetite, and weight loss. Washington prescribed medication and noted that the surgical consult had to be rescheduled because Dr. Hart ordered a CT-scan.

4

On December 15, a prison clerk scheduled the CT-scan. On December 27, an examiner at Baptist Hospital Northeast conducted the procedure. The examiner reported "abnormal soft tissue" in the lower mesentery and a thickening in the upper rectum that was "highly suspicious for a carcinoma." In February 2007, Runkle wrote a letter to the prison warden inquiring about his appointment with Dr. Hart. On February 9, the regional director of nursing responded, assuring Runkle that he had an appointment scheduled but that, due to security reasons, she could not tell him the specific date. She also informed him that she would check on his case to ensure a timely follow-up.

On February 12, Runkle had his follow-up appointment with Dr. Hart. After reviewing the CT-scan, Dr. Hart decided to proceed with a lower bowel resection. On February 26, Runkle was admitted to Baptist Hospital Northeast, where Dr. Hart performed an exploratory laparotomy, resected two portions of Runkle's small bowel, and diagnosed him with metastatic rectal carcinoma. Dr. Hart conferred with Dr. Kemen post-surgery. That same day, Dr. Kemen entered a consultation report, summarizing his findings from a post-operative physical exam of Runkle. On February 27, Dr. Hart inserted a Groshong port (a type of intravenous catheter) in Runkle, anticipating that chemotherapy would take place. On March 3, Runkle was discharged to KSR's medical dorm. Dr, Kemen noted that Runkle would have a follow-up visit with Dr. Hart, as well as chemotherapy treatment.[2]

---

[2]Plaintiff claimed below that Dr. Kemen was deliberately indifferent to Runkle's needs during the course of chemotherapy that followed the February 2007 procedure. However, Plaintiff has abandoned that claim on appeal.

**B.**

In December 2007, Runkle brought this action against Dr. Kemen (and other defendants who are not parties to this appeal), alleging deliberate indifference to his serious medical needs under the Eighth Amendment. Because Runkle passed away while this action was pending, Plaintiff was substituted as the interested party. The district court granted Dr. Kemen's summary judgment motion, ruling that the evidence was insufficient for a reasonable jury to conclude that Dr. Kemen was deliberately indifferent to Runkle's serious medical needs. *See Runkle v. Pancake*, 08-cv-188, 2012 WL 3684345 (W.D. Ky. Aug. 27, 2012). Plaintiff timely appealed.[3]

**II.**

**A.**

"We review de novo the district court's grant of summary judgment." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In considering a motion for summary judgment, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Hawkins*, 517 F.3d at 332.

---

[3]The district court also sua sponte dismissed Plaintiff's state-law claims without prejudice and denied Plaintiff's motion to strike Dr. Kemen's affidavit; neither ruling, however, is challenged on appeal.

"[A] prisoner's Eighth Amendment right is violated when prison doctors or officials are deliberately indifferent to the prisoner's serious medical needs." *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). An Eighth Amendment claim has an objective and subjective component. *Id.* "To satisfy the objective component, the plaintiff must allege that the medical need at issue is 'sufficiently serious.'" *Id.* at 702–03 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). "To satisfy the subjective component, the plaintiff must allege facts which, if true, would show that the [doctor or] official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Id.* at 703 (citing *Farmer*, 511 U.S. at 837). "The requirement that the [doctor or] official have subjectively perceived a risk of harm and then disregarded it is meant to prevent the constitutionalization of medical malpractice claims; thus, a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment." *Id.* (citing *Estelle*, 429 U.S. at 106; *Farmer*, 511 U.S. at 835).

**B.**

As to the objective component, Dr. Kemen argues that Plaintiff failed to offer medical evidence showing that his conduct caused any delay to Runkle's medical detriment. In support, Dr. Kemen cites circuit precedent holding that "[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed." *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001) (internal quotation marks omitted; alteration in original).

In *Napier*, we explained that this requirement goes to the objective prong of the Eighth Amendment analysis, as it ensures an accurate appraisal whether the "alleged deprivation is sufficiently serious." *Id.* (internal quotation marks omitted).

"[*Napier*'s] 'verifying medical evidence' requirement[, however,] is relevant to those claims involving minor maladies or non-obvious complaints of a serious need for medical care." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 898 (6th Cir. 2004). We have held that

> where a plaintiff's claims arise from an injury or illness 'so obvious that even a layperson would easily recognize the necessity for a doctor's attention,' the plaintiff need not present verifying medical evidence to show that, even after receiving the delayed necessary treatment, his medical condition worsened or deteriorated. Instead, it is sufficient to show that he actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame.

*Id.* at 899–900 (internal citation omitted).

Here, there is no dispute that Runkle's condition required a physician's attention. In a prior appeal in this same litigation, we recognized: "A history of colon cancer, with the potential of recurrence, presents a sufficiently serious medical need. From July 2003 until his death Runkle underwent multiple surgeries, had numerous doctor's appointments, and received a battery of diagnostics in treating—then monitoring—his cancer." *Runkle*, 435 F. App'x at 484.

We need not decide whether Runkle's medical needs were addressed within a reasonable time frame because, as discussed below, the evidence is insufficient for a reasonable jury to conclude that Dr. Kemen disregarded a substantial risk to those needs.

## C.

As to the subjective component, Plaintiff argues that three periods of alleged delay permit a reasonable jury to conclude that Dr. Kemen was deliberately indifferent to Runkle's medical needs: (1) the sixteen-day period between Runkle's October 18, 2006 arrival at KSR and Dr. Kemen's November 3 review of Runkle's records; (2) the six-day period between Dr. Kemen's submission of the November 3 sigmoidoscopy consult request and the review committee's November 9 decision to forgo that request and instead approve a surgical consult; and (3) the over three-month period between the November 9 surgical consult approval and the February 26, 2007 surgery and diagnosis of recurrent cancer.

The sixteen-day period between Runkle's arrival at KSR and Dr. Kemen's review of his medical records does not permit a reasonable jury to conclude that Dr. Kemen was deliberately indifferent. Plaintiff opines that had Dr. Kemen reviewed available KSR and LSCC records, he would have been aware of Runkle's cancer history and pain, Dr. Fleming's urgent transfer order recommending surgery, Washington's surgical consult request, and the colonoscopy. Although Plaintiff disagrees with Dr. Kemen's decision to wait to review the original colonoscopy report before deciding how to proceed, a reasonable jury could not draw the inference that Dr. Kemen disregarded a risk to Runkle's medical needs during this very period when his medical staff actively took steps to obtain Runkle's complete records. Dr. Hart, like Dr. Kemen, also expressed a need to see the original colonoscopy report before proceeding with any course of treatment.[4] Thus, Dr.

---

[4]To the extent Plaintiff asserts that Dr. Kemen should have obtained his records in a more expedient manner or believes that the available records were enough for Dr. Kemen to proceed with recommending surgery, such contentions do not permit the inference that Dr. Kemen acted with disregard to Runkle's medical needs.

Kemen's decision to review the original report does not support the theory that he disregarded a risk to Runkle's needs "by failing to take reasonable measures" to address them. *Farmer*, 511 U.S. at 847; *see id.* at 844 ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.").

Further, the six-day delay between Dr. Kemen's sigmoidoscopy consult request and the review committee's approval of Washington's surgical consult request does not establish a triable issue. It cannot be said that Dr. Kemen disregarded a risk to Runkle's medical needs when he specifically ordered a sigmoidoscopy to be performed "ASAP" and noted the likelihood of recurrent cancer. His sigmoidoscopy consult request was also reasonably consistent with Dr. Scott's recommendation to repeat the colonoscopy procedure if the October 2006 biopsies did not show malignancy. Dr. Scott found a tubular adenoma in the sigmoid colon; thus, Dr. Kemen did not order a full colonoscopy but a less invasive sigmoid colon exam and biopsy to evaluate the mass.

Plaintiff asserts that because Dr. Kemen's sigmoidoscopy consult request conflicted with Washington's surgical consult request, Dr. Kemen must not have reviewed Runkle's chart to notice Washington's notation. It is not apparent that these two requests were in conflict. Dr. Kemen stated that he ordered a sigmoidoscopy with biopsy to confirm whether a less invasive form of surgery would be the better course. But, even assuming that Dr. Kemen's testimony about his review of Runkle's records and his sigmoidoscopy consult request supports the inference that he failed to review Runkle's complete record, under the circumstances presented here such conduct does not amount to more than a medical malpractice claim, which is not cognizable under the Eighth

Amendment. *See Estelle*, 429 U.S. at 106; *Hill v. Jones*, No. 98-5100, 2000 WL 571948, at * 3 (6th Cir. May 3, 2000) ("[A] disagreement between medical personnel over the appropriate course of treatment is insufficient to establish an Eighth Amendment claim."); *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976) ("Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law."). Dr. Kemen took definitive steps to evaluate whether Runkle had recurrent cancer and he concurred in the review committee's decision to approve the surgical consult, hardly cause for a jury to find that he disregarded his patient's medical needs.

Turning to the period between the November 9, 2006 surgical consult approval and the February 26, 2007 procedure, Plaintiff argues that: (1) Dr. Kemen's decision to discharge Runkle to the general prison population was reckless and in violation of Kentucky Prison Policy No. 13.2, as he did not ensure that another primary care provider was assigned to Runkle during this time period; and (2) Dr. Kemen did nothing during this period to expedite the scheduling of Runkle's surgery. Overlapping with these contentions, Plaintiff argues that the district court erred in finding no genuine issue as to any material fact on two questions: (1) whether Dr. Kemen's decision was contrary to Kentucky Prison Policy No. 13.2, and (2) whether Runkle had a primary care provider after his discharge.

As the district court correctly stated, whether Dr. Kemen violated a prison regulation is not determinative of whether he violated the Eighth Amendment; however, if Dr. Kemen discharged Runkle with the knowledge that doing so would result in Runkle's receiving inadequate care,

Plaintiff may have a viable constitutional claim. Policy No. 13.2 defines a primary care provider as "the institutional medical doctor, nurse practitioner or physician assistant who evaluates the inmate's total health needs; provides personal medical care; and, if medically needed, preserves continuity of care and coordinates other providers of health services." Nurse practitioners, by definition, may serve as primary care providers and in fact do so at KSR. To distribute responsibility for inmate healthcare, KSR assigns primary care providers based on where inmates are housed and by inmate number. Dr. Kemen was the primary care provider in the post-hospital unit of the medical dorm. He opined that Washington was Runkle's medical provider when he was discharged to the general prison population, a fact Plaintiff disputes. Plaintiff points out that the December 2006 CT-scan authorization form indicates that Dr. Kemen was Runkle's primary care provider.

The prison policy does not prohibit a prison physician from discharging a patient to the general population. Dr. Kemen, in his medical judgment, determined that Runkle was stable enough not to require constant care in the medical dorm. Plaintiff fails to show that Dr. Kemen's judgment was so inadequate to support a reasonable inference that he was deliberately indifferent to Runkle's health. Whether Dr. Kemen, Washington, or someone else was Runkle's primary medical provider after his discharge is immaterial because Runkle continued to receive medical care. Runkle had visits with various nurse practitioners about his abdominal pain during this period, had medications refilled or prescribed, and underwent the CT-scan at Dr. Hart's request before the doctor proceeded with surgery. And Dr. Kemen specifically agreed with Dr. Hart's assessment that a CT-scan was needed when asked by a CorrectCare review nurse, as opposed to deflecting questions on the matter.

12

Thus, the record does not support an inference that Dr. Kemen knew that Runkle would receive inadequate care after being discharged from the medical dorm to the general population.

Plaintiff faults Dr. Kemen for not expediting his surgery. Although a delay in diagnosis or treatment may suggest a disregard to inmate health in certain circumstances, Plaintiff offers no evidence that Dr. Kemen was responsible for scheduling Runkle's appointments with outside providers or was even made aware of any alleged scheduling delay and then failed to act. As the district court correctly concluded, "there is no basis for imputing any improprieties on the part of other members of the KSR medical staff to Dr. Kemen during this time period." *Runkle*, 2012 WL 3684345, at *10.

Relevant to all three periods of alleged delay, Plaintiff argues that the district court failed to take into account two "undisputed," material facts, namely that Dr. Kemen allegedly "never saw" Runkle as a patient from his October 2006 arrival at KSR until his February 2007 surgery and "never reviewed" Runkle's LSCC and KSR medical records.

Although Dr. Kemen did not personally examine Runkle upon his arrival at KSR, Nurse Practitioner Haun did. Haun concluded that the best course of action was to continue Runkle's current medicine and to obtain Runkle's complete records including the colonoscopy report. As Haun worked with Dr. Kemen in the same unit, the two routinely discussed the history and exams of new patients. Dr. Kemen, who was in charge of the unit, testified that he was aware of Runkle's arrival. Because Haun had already examined Runkle, Dr. Kemen did not conduct another exam and determined that the next appropriate step was to obtain and review Runkle's medical records. Dr. Kemen, therefore, did not disregard a risk to Runkle's health by not performing a redundant physical

exam.  Moreover, that Dr. Kemen ordered a different consult request than Washington does not mean that there is an *undisputed* fact that he failed to review Runkle's medical records.  Even so, Dr. Kemen's conduct in this regard would at most support a medical malpractice claim, which is not cognizable under the Eighth Amendment.

## III.

For the foregoing reasons, we AFFIRM the district court's judgment.