RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0322p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

OSCAR SANTIAGO,

        *Plaintiff-Appellant*,

    *v.*

No. 12-4075

DR. KURT RINGLE and DR. CONSTANCE
MOSHER, individually,

        *Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 3:10-cv-00173—David A. Katz, District Judge.

Argued: October 3, 2013

Decided and Filed: November 5, 2013

Before: COLE, KETHLEDGE, and STRANCH, Circuit Judges.

_____

### COUNSEL

**ARGUED:** Rickell Howard, OHIO JUSTICE & POLICY CENTER, Cincinnati, Ohio, for Appellant. Debra Gorrell Wehrle, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellees. **ON BRIEF:** Rickell Howard, David Singleton, OHIO JUSTICE & POLICY CENTER, Cincinnati, Ohio, for Appellant. Debra Gorrell Wehrle, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellees.

_____

### OPINION

_____

COLE, Circuit Judge. After a delay in receiving dermatologist-recommended treatments for a painful skin condition, inmate Oscar Santiago sued his prison doctors under 42 U.S.C. § 1983. He claimed violation of the Eighth Amendment's prohibition of cruel and unusual punishment. The district court initially denied the doctors' motion

for summary judgment, but on a motion to reconsider the court entered summary judgment in favor of the doctors.  The court also granted a second motion for summary judgment, finding the doctors entitled to qualified immunity.  Santiago now challenges the district court's grants of summary judgment on the merits and on the basis of qualified immunity.  Because Santiago has not proved that the delay in his treatment caused a serious medical need, nor that the doctors acted with deliberate indifference, we affirm.

## I.  BACKGROUND

### A.     Relevant Facts

Plaintiff-Appellant Oscar Santiago is an inmate of the Marion Correctional Institute ("MCI") in Marion County, Ohio.  Defendant-Appellants Kurt Ringle and Constance Mosher were MCI's Medical Director and Assistant Medical Director.  Because Dr. Ringle and Dr. Mosher moved for summary judgment, we consider the evidence and draw all reasonable inferences in the light most favorable to Santiago.  *See Tysinger v. Police Dep't of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006).

Complaining of severe pain, swelling, and a rash, Santiago was seen by Dr. Mosher on January 31, 2008.  Notes in Santiago's medical chart from that day state the following: "Bilateral leg pain, knee pain, ankle pain onset approx. 2 wks ago. Progressively worse over last 3-days.  Unable to walk to infirmary or climb into top bunk.  'Feels like hot razors over Achilles tendons and the bones of my knees are gonna pop out.'" Dr. Mosher prescribed Tylenol to treat Santiago's pain and antibiotics to treat what she thought might be Methicillin-resistant Staphylococcus aureus (MRSA).

Santiago was seen the next day by Dr. Ringle, who diagnosed him with erythema nodosum ("EN"), a skin inflammation disorder.  Dr. Mosher's affidavit characterizes EN as "an uncomfortable but non-dangerous skin condition with symptoms that typically disappear in about six weeks but may recur."  Dr. Mosher's affidavit also states that because there is no known cure for EN, the "standard treatment" is to prescribe bed rest, an anti-inflammatory medication, and various treatments to alleviate the discomfort

and risks of the underlying symptoms. Dr. Ringle prescribed an anti-inflammatory medication and an antibiotic.

Four days later, on February 5, Santiago complained of increased pain and swelling. He was transferred to The Ohio State University ("OSU") Medical Center. Doctors there diagnosed Santiago with EN and arthralgias, a severe joint-pain condition, and prescribed an anti-ulcer agent and a different anti-inflammatory medication. Santiago was discharged after two days, and he eventually returned to MCI on February 11. A nursing note from that day stated that he "denies any discomfort at this time." Still, Dr. Ringle prescribed a wheelchair and cane, the OSU-prescribed anti-inflammatory medication, a different anti-ulcer agent, Tylenol, and Benadryl. Dr. Ringle also ordered a dermatology consult.

Santiago was seen on February 20 by an OSU dermatologist, who recommended treating Santiago's condition with a topical steroid ointment, compression hose, and a saturated solution of potassium iodide, also known as SSKI. Dr. Mosher's affidavit states that SSKI may help treat EN but is not part of the standard treatment. The recommendations were transcribed into Santiago's medical chart that day, but they were not signed and ordered. Dr. Ringle told Santiago later that evening that he would prescribe the dermatologist's recommendations.

Each day on February 22, 23, 24, and 25, Santiago asked the MCI nursing staff about the recommended treatments. The nursing staff denied knowledge of the treatments until, on the 25th, two nurses found Santiago's unsigned chart under paperwork on Dr. Ringle's desk. Apparently, Dr. Ringle had been on vacation since February 21. On February 26, a nurse told Santiago that the treatments were "being taken care of." Dr. Mosher, who was covering Dr. Ringle's duties while he was away, signed the order for the three recommended treatments on February 27. Santiago received the topical steroid ointment on February 29 and the compression stockings on March 10.

Santiago waited longer for the SSKI. Because SSKI is a non-formulary drug, the Ohio Department of Rehabilitation and Correction does not stock it, and a correctional

institute's medical director must obtain approval to order the drug. Though Dr. Mosher had ordered SSKI on February 27, apparently without approval, Dr. Ringle signed an order discontinuing SSKI on March 3. The next day, Santiago's mother called various prison officials to complain that Santiago had not received all of his treatments. On March 5, Dr. Ringle sought and received approval to purchase SSKI, examined Santiago, prescribed SSKI for him, and recommended a rheumatology consult. Santiago received the SSKI on March 17. Before receiving SSKI, Santiago remained in pain and continued to rely on a wheelchair. Shortly after he began SSKI, his pain and other symptoms improved. Santiago continued to receive the anti-inflammatory medication, anti-ulcer agent, Tylenol, and Benadryl that Dr. Ringle and Dr. Mosher had previously prescribed while he waited for the dermatologist's recommended treatments.

###     B.     Procedural History

Santiago filed a pro se complaint against Dr. Ringle and Dr. Mosher in their individual capacities under 42 U.S.C. § 1983. He alleged violations of his Eighth and Fourteenth Amendment rights, claiming that the doctors were deliberately indifferent to his serious medical needs when they delayed the treatments recommended by the dermatologist on February 20, 2008. The doctors moved for summary judgment, arguing that Santiago could not substantiate his deliberate indifference claim, and the district court denied summary judgment. In genuine dispute, the court found, were facts about the delay of Santiago's medical treatment and the seriousness of his suffering that could support the subjective and objective components of Santiago's Eighth Amendment claim.

The doctors moved for reconsideration and filed a second motion for summary judgment, this one based on qualified immunity. The district court granted both motions and entered summary judgment in favor of the doctors. On reconsideration, the court found it had "mis-apprehended the facts regarding the dermatologist's treatments," which were recommendations and not part of a prescribed plan. While "interruption of a prescribed plan of treatment could constitute a constitutional violation" under *Estelle v. Gamble*, 429 U.S. 97 (1976), the court found that the doctors' delay in implementing

the dermatologist's recommendations could not violate the Eighth Amendment.  To "prevent manifest injustice," the court reconsidered its initial ruling and entered summary judgment for the doctors.  The court then held that because Santiago could not show a constitutional violation, the doctors were also entitled to qualified immunity.

Santiago timely appealed.  We have jurisdiction under 28 U.S.C. § 1291.

## II.  ANALYSIS

### A.        Standard of Review

This court reviews de novo a grant of summary judgment, including one based on qualified immunity.  *Wallace v. Midwest Fin. & Mortg. Servs., Inc.*, 714 F.3d 414, 418 (6th Cir. 2013); *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996).  A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.  56(a).  A genuine dispute of material fact exists when there is sufficient evidence, considered in the light most favorable to the nonmoving party, for a reasonable jury to find for the nonmoving party.  *Tysinger*, 463 F.3d at 572.  Once the moving party has identified what it believes shows an absence of a genuine dispute of material fact, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986) (quoting Fed. R. Civ. P. 56) (internal quotation marks omitted).

Santiago brings his claims under 42 U.S.C. § 1983.  To succeed on such a claim, Santiago must demonstrate that a person acting under color of state law "deprived [him] of rights, privileges or immunities secured by the Constitution or laws of the United States." *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005).  Dr. Ringle and Dr. Mosher do not dispute that they acted under color of state law, so we assess whether the doctors violated Santiago's constitutional rights.

**B.      Eighth Amendment Claim**

A prison doctor violates the Eighth Amendment when she exhibits "deliberate indifference to [the] serious medical needs" of a prisoner. *Estelle*, 429 U.S. at 104.  An Eighth Amendment claim has an objective component and a subjective component. *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).  The objective component requires a plaintiff to prove a "sufficiently serious" medical need, and the subjective component requires a plaintiff to prove that the doctors had a "sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted).

As an initial matter, our cases do not support the notion that a prison doctor who delays treatment may escape liability simply because the treatment was recommended rather than prescribed.  "[I]nterruption of a prescribed plan of treatment could constitute a constitutional violation," *Boretti v. Wiscomb*, 930 F.2d 1150, 1154 (6th Cir. 1991), because such an act could manifest deliberate indifference, *Estelle*, 429 U.S. at 104–05.  But other acts could also manifest deliberate indifference. *See id.*  Thus, delay of a recommended plan of treatment could constitute a constitutional violation if the doctor acted with deliberate indifference to a serious medical need.  The district court erred when it granted the doctors' motion to reconsider and entered summary judgment in their favor without properly addressing the deliberate indifference standard.  Nevertheless, because Santiago did not satisfy either the objective or subjective components of his Eighth Amendment claim, we affirm the district court's judgment. *See Dixon v. Clem*, 492 F.3d 665, 673 (6th Cir. 2007) (noting that we "may affirm on any grounds supported by the record even if different from the reasons of the district court" (internal quotation marks citation omitted)).

*1.      Objective Component*

The objective component requires a plaintiff to prove a "sufficiently serious" medical need, *Farmer*, 511 U.S. at 834, which is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention," *Harrison v. Ash*, 539 F.3d 510,

518 (6th Cir. 2008) (internal quotation marks omitted). If the plaintiff's claim, however, is based on "the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious," *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 898 (6th Cir. 2004), the plaintiff must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment," *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001) (internal quotation marks omitted).

Santiago has not established a serious medical need on the record before us. Because he challenges only the doctors' actions between February 20 and March 17, we assess the medical need experienced during that period alone. By February 20, Santiago had complained of severe pain, had presented with "red raised nodules extending from his ankles to his knees" that were "painful to touch," and had been diagnosed with EN. Also by that day, the doctors had prescribed various medications to treat his condition and had issued him a wheelchair and cane to help him move. Santiago is correct that pain can be a sufficiently serious medical need, *see Boretti*, 930 F.2d at 1154–55, and on this record a reasonable jury could find that Santiago was still in pain between February 20 and March 17. But Santiago does not allege that he received *no* medical treatment between February 20 and March 17—indeed, he continued to receive the medications Dr. Ringle and Dr. Mosher had previously prescribed while he waited for the dermatologist's recommended treatments. Instead, Santiago complains that he was delayed in receiving a *specific type* of medical treatment, the dermatologist's recommendations. He therefore disputes the adequacy of the treatment he received during that period.

In a case like this, involving a claim based on the prison's failure to treat a condition adequately, "medical proof is necessary to assess whether the delay caused a serious medical injury." *Blackmore*, 390 F.3d at 898; *see also Napier*, 238 F.3d at 742; *Blosser v. Gilbert*, 422 F. App'x 453, 460–61 (6th Cir. 2011) (holding that a prisoner who was "regularly examined by the medical staff at the prison and received his pain medication, monitoring, and care" but, despite an emergency room doctor's recommendation, was not referred to a specialist for almost a month could not succeed

without providing "verifying medical evidence of the detrimental effect of the delay") (citations omitted).  For example, if a prisoner's alleged medical need would have been serious absent any treatment, the prisoner could submit medical proof that the provided treatment was not an adequate medical treatment of his condition or pain.  But here, the record contains no such proof.  We therefore hold that Santiago has not provided sufficient evidence for a reasonable jury to conclude that he experienced a serious medical need, and thus he has not satisfied the objective component of his Eighth Amendment claim.

### 2.        *Subjective Component*

The subjective component requires a plaintiff to prove that the doctors had a "sufficiently culpable state of mind," equivalent to criminal recklessness.  *Farmer*, 511 U.S. at 834, 839–40 (internal quotation marks omitted).  To be liable, the doctors need not act "for the very purpose of causing harm or with knowledge that harm will result," *id.* at 835, but they must act with more than mere negligence, *Miller v. Calhoun Cnty.*, 408 F.3d 803, 813 (6th Cir. 2005).  For example, "[w]hen a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation."  *Comstock*, 273 F.3d at 703.  Still, a prison doctor "has a duty to do more than simply provide some treatment to a prisoner who has serious medical needs; instead, the doctor must provide medical treatment to the patient without consciously exposing the patient to an excessive risk of serious harm."  *LeMarbe v. Wisneski*, 266 F.3d 429, 439 (6th Cir. 2001).

An official is deliberately indifferent where she (1) "subjectively perceived facts from which to infer substantial risk to the prisoner," (2) "did in fact draw the inference," and (3) "then disregarded that risk."  *Comstock*, 273 F.3d at 703 (citing *Farmer*, 511 U.S. at 837).  Since government officials do not readily admit the subjective component, a factfinder may infer from circumstantial evidence, including "the very fact that the risk was obvious," that a prison official knew of a substantial risk.  *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009) (citations omitted).

The record before us does not contain enough evidence to find that the doctors acted with the requisite mens rea.  Again, because Santiago challenges only the care he received between February 20 and March 17, we assess the doctors' subjective intent during that period.

### a.      Dr. Mosher

The evidence indicates that Dr. Mosher was aware of Santiago's condition and pain when she initially examined him on January 31.  But there is no evidence that she had any contact with Santiago or his medical records between January 31 and February 25 or 26, when the nurses allegedly gave her the unsigned order.  There is no evidence that Dr. Mosher was aware of the dermatologist's recommendations before February 25.  She signed the order implementing the recommendations on February 27, but the mere fact of a two-day delay here—even absent an explanation as to why—is not enough to show that Dr. Mosher purposefully waited to sign the order, let alone thought that Santiago faced a substantial risk of harm during that two-day period.  *See, e.g.*, *Runkle v. Kemen*, --- F. App'x ----, 2013 WL 2249462, at \*5–7 (6th Cir. May 23, 2013) (finding that a sixteen-day delay in reviewing medical records, a six-day delay in approving a consult request, and a three-month delay in performing surgery did not alone evidence deliberate indifference).  Similarly, after she signed the order, there is no evidence that Dr. Mosher thought the speed at which the treatments were arriving posed a substantial risk of harm, particularly since Santiago continued to receive the previously-prescribed treatments until the new ones arrived.  On this record, Santiago cannot satisfy the subjective component with respect to Dr. Mosher.

### b.      Dr. Ringle

Dr. Ringle was more involved in Santiago's treatment, and the record contains enough evidence to show that he became aware of Santiago's pain on February 1 and was aware that Santiago remained in pain on February 20.  But as with Dr. Mosher, no evidence shows that Dr. Ringle purposefully did not sign the order.  Instead, the record reveals that Dr. Ringle left the unsigned order under papers on his desk when he went on vacation.  While he was responsible for the seven-day delay between the order's

transcription on February 20 and Dr. Mosher's signing it on February 27, at most his actions evidence negligence, which is not enough to sustain an Eighth Amendment claim. *See Estelle*, 429 U.S. at 105 ("An accident, although it may produce added anguish, is not on that basis alone to be characterized as wanton infliction of unnecessary pain."); *Miller*, 408 F.3d at 813.

There is no evidence that Dr. Ringle knew of the delay until March 3, when he signed an order discontinuing the SSKI. He nonetheless ordered SSKI for Santiago two days later, even though prison protocol did not require him to do so. Uncontroverted evidence indicates that SSKI may help treat but is not an established treatment for EN, and Santiago has not established that he faced a substantial risk without the SSKI. Thus, the evidence does not show that, in initially denying the SSKI, Dr. Ringle subjectively perceived facts from which to infer substantial risk to Santiago. *See Farmer*, 511 U.S. at 838 (noting that "an official's failure to alleviate a significant risk that he should have perceived but did not" cannot support an Eighth Amendment claim).

Moreover, like Dr. Mosher, there is no evidence that Dr. Ringle thought the speed at which SSKI arrived (twelve days) posed a substantial risk of harm, especially given that Santiago continued to receive the previously-prescribed treatments and the two new dermatologist-recommended treatments. Santiago does not claim that Dr. Ringle was responsible for the delay between March 5 and March 17—nor could he, since by then Dr. Ringle had obtained approval for and ordered the SSKI. *See Lane v. Wexford Health Sources*, 510 F. App'x 385, 388 (6th Cir. 2013) (per curiam) (finding that a two-week delay did not evidence deliberate indifference where the plaintiff did not allege facts showing that the defendant was personally involved). And the mere existence of delay in receiving treatment is not enough for a jury to find deliberate indifference. *See, e.g.*, *Reilly v. Vadlamudi*, 680 F.3d 617, 625–27 (6th Cir. 2012); *Runkle*, 2013 WL 2249462, at *5–7. On summary judgment, Santiago may not simply point to a delay and argue that a jury might not believe the doctor's explanation; he must put forth some additional evidence of deliberate indifference, since ultimately he has the burden of proof at trial. *See Celotex*, 477 U.S. at 322–24. He has not done so.

Other claimed disputes of fact are immaterial to the merits. Regardless of when SSKI was readily available, and regardless of the disputed details of the doctors' conduct or lack of conduct relating to the delays, the version of facts most favorable to Santiago still cannot show that Dr. Ringle acted with conscious disregard of a serious risk to Santiago's health. That Dr. Ringle continued to provide treatment and referrals during the February 20 to March 17 period is further evidence that he did not act with deliberate indifference nor consciously expose Santiago to an excessive risk of serious harm. *See Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011); *Comstock*, 273 F.3d at 703.

A reasonable jury might be able to infer negligence from the record, but it could not find that Dr. Ringle or Dr. Mosher acted with deliberate indifference. We therefore hold that Santiago has not established the subjective component of his Eighth Amendment claim, and thus summary judgment on the merits should be entered in favor of the doctors.

### C.     Qualified Immunity

Santiago argues that the district court erred when it granted the doctors qualified immunity. This court generally asks two questions to determine whether prison officials are entitled to qualified immunity: whether "the plaintiff has shown that a constitutional violation occurred" and whether "the right was clearly established at the time of the violation." *Harris v. City of Circleville*, 583 F.3d 356, 365 (6th Cir. 2009). Because Santiago has not shown that a constitutional violation occurred, for the reasons discussed above, we affirm the district court's award of qualified immunity. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

### III.  CONCLUSION

We therefore affirm the judgment of the district court.